EOD  JAN 1 7 2001

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OUTBOARD MARINE CORPORATION, *et al.*, | ) | No. 00 B 37405 |
| | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Hon. Erwin I. Katz |
| | ) | |
| | ) | Hearing Date: January 22, 2001 |
| | ) | Hearing Time: 10:00 a.m. |

## LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE PROPOSED FINAL ADEQUATE PROTECTION AND FINANCING ORDERS

The Official Committee of Unsecured Creditors (the "Committee") of Outboard Marine Corporation and its related debtor entities ("OMC," and with its related debtor entities the "Debtors"), objects to certain terms and provisions of the proposed orders (i) granting adequate protection (the "Adequate Protection Order")[1] for the benefit of the Prepetition Lenders,[2] and (ii) approving a postpetition financing arrangement and providing related relief (the "Financing Order")[3] to the DIP Lenders. In support of its Limited Objection, the Committee respectfully represents as follows:

---

[1] The complete title of the Adequate Protection Order is "Agreed Interim Order and Proposed Final Order Granting Certain Adequate Protection Relief To The Prepetition Lenders" and is dated December 26, 2000.

[2] Capitalized terms in this Limited Objection shall have the meaning ascribed to them in the Interim Adequate Protection and Financing Orders and the DIP Term Sheet unless otherwise indicated.

[3] The complete title of the Financing Order is "Interim Order Approving Postpetition Financing And Granting Liens and Super Administrative Priority Pursuant To 11 U.S.C. §§ 364(c) And (d), Modifying The Automatic Stay and Scheduling The Final Hearing and is dated December 26, 2000.

## I.    INTRODUCTION

1.      While the Committee does not object to all of the relief provided in the Adequate

Protection and Financing Orders, certain terms and provisions of those orders run afoul of the

principles which should govern such orders as set forth in *In re Ames Department Stores, Inc.*,

115 B.R. 34 (Bankr. S.D.N.Y. 1990), and similar decisions. In *Ames*, the court was asked to

approve a postpetition financing arrangement under 11 U.S.C. § 364(c).[4] In doing so, the court

acknowledged that its "discretion is not unbridled." 115 B.R. at 37. The *Ames* court recognized

that Congress, in formulating the reorganization provisions of the Bankruptcy Code, ". . .

delicately balanced the hopes of debtors to reorganize and the expectations of creditors for

payment." *Id.* Accordingly, in reviewing proposed financing arrangements the *Ames* court found

that:

> . . . courts have focused their attention on proposed terms that
> would tilt the conduct of the bankruptcy case; prejudice, at an early
> stage, the powers and rights that the Bankruptcy Code confers for
> the benefit of all creditors; or leverage the Chapter 11 process by
> preventing motions by parties-in-interest from being decided on
> their merits. [citations]

*Id.*

2.      The *Ames* court, citing *In re Tenney Village Co.*, 104 B.R. 562 (Bankr. D. N. H.

1989), noted that financing orders would not be approved where:

> the arrangement would skew the conduct of the bankruptcy case,
> destroy the adversary process that contemplates representation by
> counsel and deprive the estate of possible rights and powers before
> the creditors' committee counsel would have a reasonable time to
> examine whether the estate had viable claims.

---

[4] All references to statutory provisions are intended to be references to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, unless otherwise indicated.

**No court of which we are aware has approved financing
arrangements with such features.**

\* \* \* \*

It is similarly the practice of this Court not to approve financing
arrangements containing clauses triggering default on the
appointment of a trustee or examiner section under 1104. Such
entrenchment of management may not be in the best interests of
the estate and only precludes parties-in-interest from seeking to
redress fraud or gross mismanagement through such an
appointment.

*Id.* at 38 (emphasis supplied).

3.      Also, the *Ames* court concluded that "a proposed financing will not be approved

where it is apparent that the purpose of the financing is to benefit a creditor rather than the

estate." *Id.* at 39. In summary a:

. . . court's discretion under section 364 is to be utilized on
grounds that permit reasonable business judgment to be exercised
so long as the financing arrangement does not contain terms that
leverage the bankruptcy process and powers or its purpose is not so
much to benefit the estate as it is to benefit a party-in-interest.

*Id.* at 40. *See also In re Saybrook Manufacturing Co. Inc.*, 963 F.2d 1490, 1494-96 (11th Cir.

1992) (financing order provisions which are not authorized by or are inconsistent with specific

provisions of the Bankruptcy Code should not be approved); *Transamerica Commercial Finance

Corporation v. Citibank, N.A. (In re Sun Runner Marine, Inc.)*, 945 F.2d 1089, 1095 (9th Cir.

1991) (despite the proposed financing arrangement being found to be "pragmatic" and "directed

toward permitting the maintenance, post-petition, of existing arrangements for dealer financing,"

it could not be approved because of its "'end run' around § 364."); *In re Willingham Investments,

Inc.*, 203 B.R. 75, 79-80 (Bankr. M.D. Tenn. 1996) (declining to approve provisions in a

postpetition financing order which purported to provide the lender with, *inter alia*, "immunity

from surcharge under 11 U.S.C. § 506(c)," and which failed to take into account the bankruptcy

court's power under 11 U.S.C. § 552(b) to allocate the proceeds of prepetition collateral to

satisfy administrative expenses incurred by the debtor's estate that would result in an increase in

the value of the lender's collateral); *In re Tenney Village Company, Inc.* 104 B.R. 562, 567-570

(Bankr. D.N.H. 1989) (proposed postpetition financing arrangement was rejected due to the

lender's overreaching, and the court considered whether the lender's interim loan should be

equitably subordinated); *In re Interco Incorporated,* 1991 W.L. 211160 at *3 (Bankr. E.D. Mo.

1991) (denying a proposed financing arrangement, which included adequate protection payments

to the prepetition lenders, based on a failure of proof that the lenders in that case "were either

oversecured or that the value of their secured collateral was depreciating." *Id.* at *2).

## II.    THE COMMITTEE'S SPECIFIC OBJECTIONS[5]

### A.    Objections to the DIP Term Sheet[6]

#### (a)    Pricing and Allocation Issues

4.      Paragraph 2 of the Financing Order approves and ratifies the DIP Term Sheet in

all respects. The DIP Term Sheet, however, contains provisions that are not reflected in either

the Adequate Protection or Financing Order. Among those provisions are (i) non-default and

default interest rates of 3.75% and 5.75%, respectively, over the defined Base Rate, (ii) a

Commitment Fee of .375% per annum of the unutilized Total DIP Commitment of $35 million,

---

[5] Because the Prepetition Lenders and the DIP Lenders are almost identical, the Adequate Protection and Financing Orders contain many similar provisions and are designed to complement each other. Consequently, where the same provision is contained in both Orders, the Committee's specific objections are intended to apply to both Orders.

[6] In addition to the Committee's specific objections to certain provisions of the DIP Term Sheet, the Committee has requested that all information and reports provided to the DIP and Prepetition Lenders pursuant to the DIP Term Sheet, or otherwise, also be simultaneously supplied to the Committee. The Debtors have agreed to modify the final Adequate Protection and Financing Orders to provide for that relief.

*plus* (iii) an astounding $1 million non-refundable Closing Fee. Notwithstanding the fact that the DIP Lenders' provisional commitment to provide up to $35 million of DIP financing may turn out to be significantly less, depending upon the forced liquidation value of the Debtors' machinery and equipment, the $1 million Closing Fee has not been prorated. In addition, as currently structured, the unsecured creditors bear the entire burden of the Closing Fee.

5.     While § 364 enumerates many permissible protections to induce a lender to provide postpetition financing, there is nothing in § 364 which allows the payment of such a disproportionately large fee that is non-refundable under all circumstances. *But see In re Defender Drugstores, Inc.*, 145 B.R. 312, 319 (Bankr. 9th Cir. 1992), *aff'g* 126 B.R. 76 (Bankr. D. Ariz. 1991) (approving an "enhancement fee" to a lender under §§ 105(a) and 364). To the extent that the DIP Lenders are entitled to a fee for allowing the Debtors' business and assets to be sold on a going concern basis, the allowance and payment of that fee should be subject to review by this court at the conclusion of the sale process. According to the DIP Lenders, most of the initial $160 million of sale proceeds generated from the going concern auction process will be paid to them and the Prepetition Lenders.[7] In fairness, the $1 million Closing Fee should not be borne by the unsecured creditors when a primary purpose of the postpetition financing arrangement is to facilitate a going concern sale of the Prepetition Lenders' collateral. As noted in *Ames*, provisions in financing orders that benefit a party in interest as opposed to the estate as a whole should not be approved. *Ames*, 115 B.R. at 40.

---

[7] Despite the fact that the Prepetition and DIP Lenders will benefit the most from the sale of their Collateral, they refuse to bear a fair share of the cost of the auction process. *See* Exhibit A, letter dated January 11, 2001 from the Lenders' counsel objecting to the use of their Collateral to pay the Houlihan Lokey Howard & Zukin success fee. The Committee disagrees with that position.

6.      In addition, if the $1 million dollar Closing Fee is being paid to or for the benefit

of the Prepetition Lenders on account of their prepetition claim, then it amounts to an

impermissible elevation of what may be an undersecured claim to administrative expense

priority.  This would violate the priority provisions of the Bankruptcy Code and should not be

allowed.  *Saybrook, supra,* 963 F.2d at 1494-95; *Sun Runner, supra,* 945 F.2d at 1095.

7.      There are other provisions of the DIP Term Sheet to which the Committee

objects.  The Committee is informed and believes that the cost of the postpetition financing, in

terms of interest and commitment fees, is higher than the cost of its prepetition financing

arrangement.  Nevertheless, the Debtors are prohibited from using cash collateral and instead are

required to re-borrow those funds from the DIP Lenders.  This has at least three detrimental

effects on the Debtors' estates.

8.      First, the Debtors are being forced to borrow from the DIP Lenders at a

substantial cost to pay interest to the Prepetition Lenders.  This effectively reduces the total DIP

Facility from $35,000,000 by the amount of the interest paid, thereby making the DIP Loan even

more expensive.  Second, the prepetition claim of the Prepetition Lenders is being impermissibly

elevated to superpriority administrative expense status.  Third, the Debtors are paying a higher

interest rate and a higher Commitment Fee to use what is essentially their own money, which is

being lent back to them by the DIP Lenders.  The DIP Lenders should only be permitted to

charge the higher interest and Commitment Fee on new funds actually advanced to the Debtors

postpetition and not on recycled cash collateral.

**(b)    Adequate Protection Payment Issues**

9.     The DIP Term Sheet requires monthly adequate protection payments in an amount equal to the interest to the Prepetition Lenders on Tranche A of the Prepetition Revolving Credit Loans (the "Prepetition Loans"). *See* DIP Term Sheet at 12. The Committee objects to this requirement for several reasons. *See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, *vacated*, 802 F.2d 777 (5th Cir. 1986), *reinstated*, 808 F.2d 363 (5th Cir. 1987), *aff'd* 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed.2d 740 (1988) (an undersecured creditor is not entitled to adequate protection payments where its collateral is not declining in value). *See also In re Weinstein*, 227 B.R. 284, 297 (Bankr. 9th Cir. 1988) (adequate protection payments are not meant to improve an undersecured creditor's position in relation to other creditors).

10.     First, the Debtors are not using the proceeds of their prepetition accounts receivable. Instead, those proceeds are being collected for the benefit of the Prepetition Lenders and turned over to them for application on the Prepetition Loans. Second, there is no evidence that the value of the Prepetition Collateral is declining in value. To the contrary, the Debtors' continued operations and ongoing efforts to maximize the value of the Prepetition Lenders' Collateral, at substantial cost to the Debtors' estates, is preserving the value of the Prepetition Lenders' Collateral. Third, even though the adequate protection payments are provisional in nature, the requirement that the Debtors make these payments when their cash flow is entirely dependent on borrowed money is burdensome and detrimental to both the Debtors' efforts to reorganize and the interests of unsecured creditors. Accordingly, there is no valid reason for the Debtors to borrow money from the DIP Lenders at a cost higher than the interest accruing, if

any, on the Prepetition Loans for the purpose of making adequate protection payments to the Prepetition Lenders.

11.     The Prepetition Lenders have demanded the adequate protection payments as compensation for the Prepetition Lenders agreeing to the DIP Lenders' postpetition priming lien on the Prepetition Collateral.  The Committee, however, disputes the need for the compensatory adequate protection payments.  The DIP Lenders have been granted liens and security interest in the Debtors' previously unencumbered machinery and equipment, which has a forced liquidation value of at least $30 million dollars, to secure the DIP Loan.  Under the doctrine of marshalling assets between competing lien claimants, the DIP Lenders' claim will be satisfied from the Debtors' machinery and equipment.  In addition, the DIP Lenders have been granted a superpriority administrative expense claim against the Debtors' estates to secure repayment of the DIP Loan.  Consequently, the DIP Loan is adequately secured by the additional collateral and the Loan's superpriority administrative expense claim status.  The Prepetition Lenders' lien on the Prepetition Collateral, while nominally primed by the lien securing the DIP Loan, has in fact not been impaired at all.  Therefore, the priming lien granted to the DIP Lenders provides no justification for the adequate protection payments.

12.     The Committee also objects to the proposed amount of the adequate protection payments. The DIP Term Sheet implies that the adequate protection payments will be made in an amount equal to "interest accruing on the Tranche A portion of the prepetition revolving credit loans." *See* DIP Term Sheet at 12.  The Adequate Protection and Financing Orders, however, require that the monthly adequate protection payments on account of the Prepetition Indebtedness be paid at the non-default rate prescribed in the DIP Term Sheet, as opposed to the

non-default rate set forth in the Prepetition Credit Agreement. *See* Adequate Protection Order at

9, ¶ 5; Finance Order at 23, ¶ 17. Consequently, not only are the Lenders seeking unnecessary

adequate protection payments, but the proposed payments are to be made based on an elevated

interest rate. The Committee objects to the proposed adequate protection payments on this

ground as well.

### (c)   Distribution and Repayment Issues

13.    The Committee also objects to the Distribution Priorities set forth in the DIP

Term Sheet. The DIP Lenders are receiving priming liens on all Collateral, including Prepetition

Collateral. Therefore, if Prepetition Collateral is sold or otherwise disposed of, the proceeds

resulting therefrom must be applied on the DIP Loan and not on the Prepetition Loans. It is not

in the Debtors' and unsecured creditors' interests to allow the higher priority and more expensive

DIP Loan to go unpaid while the Prepetition Loans are paid. To the extent the Distribution

Priorities set forth in the DIP Term Sheet require that result, the Committee objects.

### (d)   Committee Counsel Restrictions Issues

14.    The DIP Term Sheet also impermissibly limits the Carve-Out for professional

fees in two respects. *See* DIP Term Sheet at 5-6. First, the amount of the Carve-Out is woefully

inadequate, given the complexities of these cases, the extraordinary number of professionals

required to appropriately administer the Debtors' cases and the amount and nature of the

Debtors' assets and liabilities. Second, the Carve-Out attempts to unlawfully restrict the

activities of the Committee's professionals. Restrictions in financing orders which prejudice the

powers and rights that the Bankruptcy Code confers for the benefit of all creditors, or which

attempt to destroy the adversary process that contemplates unfettered representation by

Committee counsel, cannot be condoned. *Ames, supra*, 115 B.R. at 38.

15.     In *Tenney Village, supra*, the court explained that an attorney's acceptance of

limitations on his activities in representing a fiduciary in a chapter 11 case would render that

professional not disinterested, and in fact would disqualify that attorney from representing the

fiduciary. *Tenney Village*, 104 B.R. at 568-69. As to the postpetition lender's attempt to limit

the attorney's activities by a restrictive provision in a postpetition financing order, the court

stated as follows:

> It is said that a Chapter 11 lender should not be required to finance
> the prosecution of claims and defenses against it.  That is true.  If
> the lender believes that this will occur, it can elect not to make the
> loan.  **It cannot expect, however, to change the rules of a
> Chapter 11 case.**

*Tenney Village*, 104 B. R. at 569 (emphasis supplied).

### (e)     Lenders' Fees and Expenses Reimbursement Issues

16.     The DIP Term Sheet also requires the Debtors to:

> pay all costs and expenses of the DIP Agent and DIP Lenders
> (including fees and expenses of the DIP Agent's legal and financial
> advisors) relating to the negotiation, documentation and
> administration of the DIP Loan Agreement and the enforcement of
> the DIP Agent's and the DIP Lenders' rights under and in respect
> of the DIP Loan Agreement.

*See* DIP Term Sheet at 7.  While the Committee does not generally contest this provision, the

DIP Agent's and Lenders' costs and expenses must be subject to review by at least the Debtors,

the Committee and the United States Trustee for this judicial district.  In that regard, the

Committee respectfully recommends that the DIP Agent's and Lenders' costs and expenses be

submitted for review by those parties on a monthly basis and be subject to this court's approval in the event of any dispute.[8]

### (f)   Covenant and Default Issues

17.     The DIP Term Sheet describes certain Events of Default. *See* DIP Term Sheet at 11. Those include the appointment of a trustee or an examiner. *Id.* Under the rationale set forth in *Ames*, such Events of Default effectively deprive creditors of important and salutary remedies. More important, such Events of Default leverage the bankruptcy process impermissibly and entrench the Debtors' management. *Ames*, 115 B.R. at 38.

18.     In addition, the Debtors' breach of the Receivables Covenant constitutes an Event of Default. The Committee objects to this for two reasons. First, it places undue pressure on the Debtors to collect receivables that may force the Debtors to either discount the receivables or offer other inducements to account debtors in an effort to comply with the Receivables Covenant. Second, the Debtors may be unable to comply with the Receivables Covenant due to setoffs, counterclaims or other defenses asserted by account debtors. The Debtors' reorganization process and the unsecured creditors' interest therein should not be jeopardized by circumstances beyond their control.

### (g)   Section 552(b) Issues

19.     The DIP Term Sheet provides for certain Distribution Priorities. *See* DIP Term Sheet at 6-7. These include requirements for the distribution of cash proceeds from the sale or other disposition of Prepetition Senior DIP Collateral and Prepetition Junior DIP Collateral (collectively, the "Prepeitition Collateral"). However, the Distribution Priorities appear to

---

[8] This objection also applies to the payment of the costs and expenses of the Prepetition Agent and Lenders as required in the Adequate Protection portion of the DIP Term Sheet and the Adequate Protection Order.

eliminate this court's equitable power under § 552(b) to allocate the proceeds of Prepetition

Collateral according to the "equities of the case." If the Prepetition Lenders are undersecured,

and the Debtors incur administrative expense obligations to preserve the value of the Prepetition

Collateral for the benefit of the Prepetition Lenders, then this court has the power under § 552(b)

to apply the proceeds of the Prepetition Collateral to satisfy those expenses. *See Willingham*

*Investments, supra*, 203 B.R. at 79-80, and cases and authority cited therein[9] ("Under the second

exception, 'the equities of the case' dictate that [prepetition lender] be prohibited from obtaining

priority over the claims of postpetition creditors for funds expended to improve [prepetition

lender's] position."). *Accord In re Package Design and Supply Co., Inc.*, 217 B.R. 422, 425

(Bankr. W.D.N.Y. 1998) ("Together with 11 U.S.C. § 506(c), that ability helps to assure that

those who enhance the value of collateral during a bankruptcy case will not lose out to a lien on

the 'proceeds' thus enhanced."); *United States v. Van Vactor, Francis & Martin (In re Crouch)*,

51 B.R. 331, 332 (Bankr. D. Or. 1985) ("The purpose behind the 'equities of the case' rule of 11

U.S.C. § 552(b) is, in a proper case, to enable those who contribute to the production of the

proceeds during chapter 11 to share jointly with pre-petition creditors secured by proceeds.").

*See generally Levin and McGurk, Who Gets the Goodies: What Happens To The Enhancement*

*Of The Secured Parties' Collateral*, 102 Com. L. J. 55 (1997).

20.    This court's power to appropriately allocate the proceeds of Prepetition Collateral

based on the "equities of the case" rule under § 552(b) is well established in the Seventh Circuit.

---

[9] *H.R. Rep.*, No. 595, 95th Cong., 1st Sess. 377 (1997); *New Hampshire Business Development Corp. v. Cross Banking Co. (In re Cross Baking Co.)*, 818 F.2d 1027, 1033 (1st Cir. 1987); *J. Catton Farms, Inc. v. First National Bank of Chicago (In re J. Catton Farms, Inc.)*, 779 F.2d 1242, 1247 (7th Cir. 1985); *Wolters Village, Ltd. v. Village Properties, Ltd. (In re Village Properties, Ltd.)*, 723 F.2d 441, 444 (5th Cir.), *cert. denied* 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed. 2d. 823 (1984); *In re Ridgeline Structures, Inc.*, 154 B.R. 831, 832-33 (Bankr. D.N.H. 1993).

*See J. Catton's Farms, Inc. v. The First National Bank of Chicago (In re J. Catton's Farms, Inc.)* 779 F.2d 442, 1246-47 (7th Cir. 1985), and cases cited therein; *In re Chaseley Foods, Inc.* 726 F.2d 303, 306 (7th Cir. 1984) ("Section 552(b) gives the court the right to modify the security interest resulting under state law where equity requires. [citations]").  Fundamental fairness to postpetition creditors who may otherwise go unpaid, but have provided valuable goods or services to the Debtors which resulted in the preservation or enhancement of the value of the Prepetition Collateral, requires that the proposed Distribution Priorities in the DIP Term Sheet, the Adequate Protection Order and Financing Order be made subject to the equitable powers of this court as provided for by § 552(b).[10]

### (h)    Superpriority Claim Issues

21.    The DIP Term Sheet provides, as one means of adequate protection, the granting of the Prepetition Lenders' Superpriority Claims, subject only to the Carve-Out and the Superpriority Claim for the DIP Loans:

> to secure payment of the Obligations in an amount equal to the diminution in value of the Collateral available to the Prepetition Lenders from and after the Petition Date (such amount, the "Adequate Protection Obligations"), whether such diminution results from (i) the Debtors' use of such collateral, or (ii) the priming of the liens securing the Obligations under the Prepetition Credit Agreement by the liens granted to secure the DIP Loans.

*See* DIP Term Sheet at 12-13.  The Committee objects to the proposed Superpriority Claim for the Prepetition Lenders as defined in the DIP Term Sheet for the following two reasons.

---

[10] As explained in *North County Place, Ltd., et al v. Gill,* 92 B.R. 437, 444 (Bankr. C.D. Cal. 1988), § 552(b) provides the court with authority in situations which differ from those where § 506(c) may apply. ("But where as here the security at issue is the original security, section 552(b) does not give the Court any power to impose expenses on a secured creditor.  Any such power must derive from section 506(c).").

22.    First, such a claim eviscerates administrative expense claimants' rights under §

552(b). As explained above, fundamental fairness requires unpaid administrative expense

claimants to come ahead of the Prepetition Lenders' claims with respect to proceeds of the

Prepetition Collateral to the extent the administrative expense claims were incurred in preserving

or enhancing the value of the Prepetition Collateral.  Second, § 507(b) provides all of the relief to

which the Prepetition Lenders might be entitled should the value of their Prepetition Collateral

be impaired.  Consequently, the overbroad provisions of the DIP Term Sheet regarding the

Prepetition Lenders' Superpriority Claim are unnecessary.  In any event, they should not be

incorporated into either the Adequate Protection or Financing Order because they impermissibly

expand the Prepetition Lenders' rights under § 507(b).  As explained by the *Willingham*

*Investments* court:

> The plain language of § 507(b) provides a creditor with a
> superpriority to the extent its adequate protection proves
> inadequate. [citation]  This position need not be bargained for;
> rather it is automatic upon a showing and to the extent that a
> creditor's adequate protection proves inadequate. [citation]

*Willingham Investments, supra*, 203 B.R. at 80.

B.    **Objections to the Adequate Protection and Financing Orders**[11]

(i)    **Section 506(c) Issues**

23.    Paragraph 9 of the Financing Order and Paragraph 3 of the Adequate Protection

Order purport to give the DIP and Prepetition Lenders priority for their respective claims over

any claim asserted under § 506(c).  This impermissibly eliminates an important statutory right of

---

[11] The Committee's objection to certain provisions of the DIP Term Sheet also apply to those provisions which are duplicated in the Adequate Protection and Financing Orders and shall not be repeated in this portion of the Committee's Limited Objection.

administrative expense claimants and cannot be allowed as a matter of fundamental fairness and

public policy. *Ridgeline Structures, supra,* 154 B.R. at 32. *See also In re Hen House Interstate,*

*Inc.* 150 F.3d 868, 872 (8th Cir. 1998), *vacated on other grounds,* 177 F.3d 719 (8th Cir. 1999)

(*en banc*), *aff'd sub nom., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 528

U.S. 985, 120 S. Ct. 444, 145 L. Ed. 2d 1 (2000); *Willingham Investments,* 203 B.R. at 78;

*McAlpine v. Comerica Bank-Detroit (In re Brown Bros., Inc.),* 136 B.R. 470 (W.D. Mich. 1991).

24.     Moreover, Paragraph 19 of the Financing Order appears to be inconsistent with

the last sentence of Paragraph 18 of the Financing Order. That sentence indicates the Debtors

are *not* releasing § 506(c) claims which they hold in trust for creditors.[12] That savings clause,

however, is illusory if the priority of a § 506(c) claim is governed by Paragraph 19 of the

Financing Order and subordinated to the Prepetition and DIP Lenders' Superpriority Claims.

The purpose of § 506(c) would be defeated if a claim allowed under its provision were to be

subordinated to the Lenders' claims.

### (j)    Chapter 7 Expense Issues

25.     In addition, Paragraph 9 of the Financing Order purports to elevate the DIP

Lenders' Superpriority Claim over chapter 7 administrative expenses. The Committee

respectfully submits that this court does not have the power to rewrite the Bankruptcy Code or

create priorities for claims which conflict with the Bankruptcy Code. Section 726(b) gives

priority to chapter 7 administrative expenses over pre-conversion chapter 11 expenses. *In re*

*Summit Ventures, Inc.,* 135 B.R. 478, 483 (Bankr. D. Vt. 1991) ("As between these two

---

[12] While § 506(c) claims may only be brought by or in the name of a trustee or debtor in possession, the beneficiaries of such claims are unpaid administrative creditors. Consequently, just as state law fraudulent conveyance claims cannot be sold by a debtor in possession, *In re Cybergenics Corp.,* 226 F.3d 237, 245 (3rd Cir. 2000), the Debtors in this case cannot waive § 506(c) rights which they hold in trust for creditors.

competing superpriorities, we are convinced that policy reasons favor granting the greater

priority to the Chapter 7 administrative expenses. A present need to administer a Chapter 7 case

is always greater than the past, and also mooted, need of the failed Chapter 11.").

### (k)   The Committee Members' Fees and Expenses

26.   The Committee has yet another objection to the provisions of Paragraph 9 of the

Financing Order that purport to limit the scope of the Carve-Out. The Carve-Out does not

include, according to the DIP Agent and Lenders, attorneys' fees as appropriate expenses of

individual Committee members. The Committee disagrees. *See First Merchants Acceptance

Corporation v. J.C. Bradford & Co. (In re First Merchants Acceptance Corporation)*, 198 F.3d

394 (3rd Cir. 2000). As explained by the Third Circuit:

> A straightforward reading of the statute, therefore, authorizes
> reasonable allowances for attorney's fees or other professional fees
> incurred by a member of a committee, 'if such expenses are
> incurred in the performance of the duties of such committee.'

198 F.3d at 398. It would be inappropriate for this court to preclude Committee members in this

case from seeking reimbursement of their individual attorneys' fees at this time by this provision

of the Financing Order.

### (l)   Automatic Stay Issues

27.   Paragraph 16 of the Financing Order provides that the automatic stay provisions

of § 362 are vacated to allow the DIP Agent and Lenders to exercise all of their rights and

remedies under applicable law upon three (3) days' written notice to various parties, but without

further action by this court. The Lenders should be required to apply to this court for relief from

the automatic stay to enforce their rights and remedies. The burden should not be shifted to the

Debtors and the Committee to obtain emergency injunctive relief. If the burden is shifted to the

Debtors and the Committee, then the notice period must be extended, at a minimum, to either

five (5) days or three (3) business days.  The Committee and other parties must be given a fair

and meaningful opportunity to seek relief in this court if the DIP Agent and Lenders are granted

this extraordinary relief under § 362 prior to any default by the Debtors.

### (m)   Restrictions on Substantive Rights

28.   In addition, the last sentence of Paragraph 16 of the Financing Order is a bar to

the Committee, or any other party in interest, seeking any meaningful relief if the DIP Agent

declares an Event of Default.  Provisions in financing orders which seek to bar parties in interest

from exercising their rights or seeking appropriate legal or equitable remedies cannot be

approved.  *Ames, supra*, 115 B.R. at 37 (condemning the leveraging of the chapter 11 process

"by preventing motions by parties-in-interest from being decided on their merits. [citations].")

Further, the Financing Order seeks to bar the Debtors' resort to §§ 363 and 364 unless the DIP

and Prepetition Lenders consent.  *See* Financing Order at 23-24, ¶ 17.  This forced waiver of

important substantive rights is an inappropriate attempt to leverage the reorganization process

under the guise of a financing transaction that is alleged to be "in the best interests of the Debtors

and their creditors," and should not be allowed by this court.  The value of the DIP and

Prepetition Lenders' liens and interest in the Debtors' property must be adequately protected

before the Debtors can obtain relief over the Lenders' objection under §§ 363 or 364.  The

Lenders are entitled only to adequate protection and not a waiver of the Debtors' substantive

rights to protect the interests of all creditors.

## III.   CONCLUSION

29.   The Committee is sensitive to the Debtors' need to borrow money in order to appropriately administer their estates and carry out their fiduciary duties. However, that need cannot be used as a basis to disregard fundamental rights of creditors, hamstring the Committee and its professionals from carrying out their fiduciary duties or provide the Prepetition and DIP Lenders with disproportionate benefits, especially when the money being loaned will primarily benefit those very same Lenders.

30.   The Committee's objections should not be taken as any criticism of the Debtors' stance in negotiations with the Prepetition and DIP Lenders. It is recognized "that debtors-in-possession generally enjoy little negotiating power with a proposed lender, particularly where the lender has a pre-petition lien on cash collateral." *Ames, supra*, 115 B.R. at 38. Further, the Debtors' objectives are narrower than, and not identical to, those of the Committee. While the Debtors' primary concern is to maximize the value of its business and assets, the Committee must also be vigilant and protective of the rights of its constituency so that secured creditors, whether they are prepetition or postpetition lenders, do not use the postpetition financing process to insulate themselves from attack or obtain a disproportionately large share of the value of the Debtors' estates. The Committee's objectives can be accomplished and the integrity of the chapter 11 process can be preserved, while providing fair treatment to the Prepetition and DIP Lenders, if the Committee's Limited Objection is sustained.

WHEREFORE, the Committee respectfully requests that the Debtors' motions for approval of the final Adequate Protection and Financing Orders be denied unless the

Committee's Limited Objection is sustained, and that the Committee have such other and further

relief as may be appropriate under the circumstances.

Respectfully submitted,

The Official Committee of Unsecured Creditors
of Outboard Marine Corporation and Its Related
Debtor Entities

Dated: January 16, 2001          By: _____

One of its attorneys

Steven B. Towbin (#2848546)
Peter J. Roberts (#6239025)
Kathleen H. Klaus (#6211316)
D'Ancona & Pflaum LLC
111 E. Wacker Dr., #2800'
Chicago, IL 60601
(312) 602-2000

499430.v4                           19

# SIDLEY & AUSTIN
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

DALLAS

LOS ANGELES

NEW YORK

SEATTLE

WASHINGTON, D.C.

BANK ONE PLAZA

10 S. DEARBORN STREET

CHICAGO, ILLINOIS 60603

TELEPHONE 312 853 7000

FACSIMILE 312 853 7036

HONG KONG

LONDON

SHANGHAI

SINGAPORE

TOKYO

FOUNDED 1866

WRITER'S DIRECT NUMBER
(312) 853-7539

WRITER'S E-MAIL ADDRESS
mclement@sidley.com

January 11, 2001

Mark McDermott
Skadden, Arps, Slate, Meagher & Flom
(Illinois)
333 West Wacker Drive
Suite 2100
Chicago, IL 60606

Re:    HLHZ Retention Motion

Dear Mark:

Following up our discussions over the past several days, the Prepetition Lenders and the DIP Lenders need clarification in the HLHZ retention order that they are not consenting to the invasion of their Collateral to pay HLHZ's success fee.

Please contact me at your earliest convenience to discuss this matter further.

Sincerely yours,

Matthew A. Clemente

cc:    David Kurtz, Esq. (via fax)
Steve Towbin, Esq. (via fax)
Larry Nyhan, Esq.
Larry Cannariato

EXHIBIT
A